# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

MAXELL, LTD.,

§
§
Plaintiff,   §
§
v.   §
§ Case No. 5:19-CV-00036-RWS
APPLE INC.,   §
§
Defendant.   §
§

## OPPOSITION BY DLA PIPER LLP (US) TO MAXELL, LTD'S MOTION TO DISQUALIFY DLA PIPER LLP (US)

Page

TABLE OF CONTENTS

INTRODUCTION.................................................................................................- 1 -

FACTUAL BACKGROUND ...................................................................................- 2 -

    A.    DLA Implemented An Ethical Screen Before It Was Retained In This Case..................................................................................................... - 2 -

    B.    DLA Later Learned That Mayer Brown Included Seven Maxell-Related Emails In The Files Of A Different Client Who Followed Mr. Park To DLA As Part Of An Electronic Transfer To DLA Via The Cloud................................................................................................. - 4 -

    C.    Apple Retained DLA To Serve As Its Lead Trial Counsel In This Case...... - 5 -

LEGAL STANDARD ............................................................................................- 6 -

ARGUMENT......................................................................................................- 7 -

    I.    Absolutely No Confidences Have Been Disclosed, DLA At All Times Has Acted Appropriately And In Good Faith, And Maxell Has Failed To Prove Otherwise. ........................................................................ - 7 -

        A.    The Uncontroverted Evidence Confirms That No Maxell Confidences Have Been Shared With Any Lawyer Representing Apple. ................................................................................... - 8 -

        B.    DLA Reasonably Screened Mr. Park From The Apple Team, Which Alternatively Rebuts Any Presumption Of Shared Confidences...............................................................................- 10 -

        C.    DLA Provided To Maxell Adequate Notice of Its Representation of Apple. .............................................................- 12 -

        D.    DLA Certified, And Is Willing To Certify, Its Ongoing Compliance. ..........................................................................- 13 -

    II.    Disqualifying DLA Would Be Inequitable And Highly Prejudicial To Apple................................................................................................- 13 -

CONCLUSION..................................................................................................- 15 -

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Abney v. Wal-Mart*,
984 F. Supp. 526 (E.D. Tex. 1997)..................................................................................7

*Am. Int'l Grp., Inc. v. Bank of Am. Corp.*,
827 F. Supp. 2d 341 (S.D.N.Y. 2011)............................................................................10

*Arista Records LLC v. Lime Grp. LLC*,
No. 06 CV 5936 KMW, 2011 WL 672254 (S.D.N.Y. Feb. 22, 2011) ....................... 12, 15

*Biote Med., LLC v. Jacobsen*,
No. 4:18-CV-866, 2020 WL 2813201 (E.D. Tex. May 29, 2020)......................................7

*BMO Harris Bank N.A. v. Novak Druce Connolly Bove & Quigg LLP*,
No. CV H-17-1616, 2018 WL 7253967 (S.D. Tex. Feb. 22, 2018)....................................6

*Carbo Ceramics, Inc. v. Norton-Alcoa Proppants*,
144 F.R.D. 158 (N.D. Tex. 1994) ..................................................................................15

*In re Del-Val Fin. Corp. Sec. Litig.*,
158 F.R.D. 270 (S.D.N.Y. 1994)....................................................................................12

*F.D.I.C. v. U.S. Fire Ins. Co.*,
50 F.3d 1304 (5th Cir. 1995)......................................................................................6, 14

*Galderma Labs., L.P. v. Actavis Mid Atl. LLC*,
927 F. Supp. 2d 390 (N.D. Tex. 2013)............................................................................7

*Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*,
No. 3:10-CV-276-F, 2011 WL 13201855 (N.D. Tex. Sept. 12, 2011)...........6, 13, 14, 15

*Lemaire v. Texaco, Inc.*,
496 F. Supp. 1308 (E.D. Tex. 1980)................................................................................9

*Levin v. Raynor*,
No. 03cv4697 (GBD), 2004 WL 2937831 (S.D.N.Y. Dec. 17, 2004) .............................10

*Manning v. Waring, Cox, James, Sklar & Allen*,
849 F.2d 222 (6th Cir. 1988).......................................................................................10

*In re Meador*,
968 S.W.2d 346 (Tex. 1998).........................................................................................9

*Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*,
    60 F. Supp. 3d 751 (W.D. Tex. 2014) ...............................................................7, 15

*In re ProEducation Int'l, Inc.*,
    587 F.3d 296 (5th Cir. 2009)..............................................................6, 7, 14

*Reilly v. Computer Assocs. Long-Term Disability Plan*,
    423 F. Supp. 2d 5 (E.D.N.Y. 2006) ...............................................................12

*Sailsbery v. Vill. of Sauk Vill.*,
    No. 15 C 10564, 2017 WL 5885323 (N.D. Ill. Nov. 28, 2017) ...........................12

*Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205,*
    17 F.3d 1059 (7th Cir. 1994)...............................................................12

*Silicon Graphics Inc. v. ATI Techs., Inc.*,
    741 F. Supp. 2d 970 (W.D. Wis. 2010) ...............................................................7

*Simmons v. Houston Cty., Texas*,
    No. 9:05-CV-82, 2006 WL 8440543 (E.D. Tex. Feb. 2, 2006)...........................6, 8

*Soverain Software LLC v. CDW Corp.*,
    No. 6:07 CV 511, 2010 WL 1038731 (E.D. Tex. Mar. 18, 2010) ......................6

## Other Authorities

ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 442 (2006).................................9

ABA Standing Committee on Ethics & Professional Responsibility, Report to the
    House of Delegates (Feb. 2009)...............................................................7

## Rules

Comment 10 to Model Rule 1.0(k).................................................................10

Fed. R. Civ. P. 26(b)(5)(B) ...............................................................9

Local Rule AT-2...............................................................6

Model R. Prof. Cond. 1.0(k).................................................................10

## INTRODUCTION

It is uncontroverted that nobody on DLA's Apple team ever received or even solicited any of Maxell's privileged or confidential information from Justin Park. Maxell's carefully-crafted hearsay insinuation that Mr. Park stole Maxell's documents is demonstrably false. Nevertheless, Maxell tries to disqualify DLA, Apple's lead trial counsel, just days before trial. Maxell has failed to meet its burden of proof for disqualification.

Faced with these insurmountable hurdles, Maxell says instead that Mr. Park—the former Mayer Brown partner who joined DLA's Washington, DC office in January 2020 and never discussed anything about Maxell with any lawyer or paralegal representing Apple—should have realized sooner that *Mayer Brown* mistakenly had included a handful of Maxell documents in *other* client files that *Mayer Brown* sent via the cloud to Mr. Park when those clients moved to DLA.

On July 30, 2020, Peter Lindau, from DLA's Office of General Counsel ("OGC"), communicated with Mr. Park, who understood that he could not speak with anyone at DLA about Maxell or any of Mayer Brown's other clients who did not join him at DLA. That communication was on the same day that Jamie Beaber, Maxell's lead counsel and Mr. Park's friend, initially contacted Mr. Park to ask about an ethical wall in an ITC matter for which Apple had just retained DLA. Also on that same day, Mr. Lindau initiated a screening process at DLA, which was completed well before August 28, 2020, when Apple first retained DLA in this case. Mr. Park and Mr. Lindau have confirmed all of the foregoing under oath.

Maxell's final argument about its supposed lack of notice rings hollow. DLA advised Mayer Brown of its retention by Apple in the ITC matter within two days, and a month before DLA was retained in this case. Mayer Brown also plainly knew of Mr. Park's work with Maxell while at Mayer Brown, and it was told about the measures DLA had put in place to ensure that DLA's Apple team (in Texas and California) did not discuss Maxell, and certainly not any of its confidences, with Mr.

Park (in Washington, DC).  This is reflected in the correspondence Maxell submitted with its motion, including two sworn declarations from DLA—correspondence that Maxell's motion mischaracterizes.

Maxell seeks to substantially prejudice Apple by disqualifying its lead trial counsel, who have devoted more than 3,000 hours to prepare for trial in this case, which inevitably would require a trial continuance.  Indeed, confirming the tactical nature of this motion, Maxell inexplicably failed to disclose its purported concerns to the Court during an all-day hearing on October 8 for dispositive and other motions, allowing DLA to continue to handle the substance of this case then and to continue its extensive efforts on Apple's behalf until this motion is heard on November 12.  Nor has Maxell advised the court of the purported concerns in the ITC matter or a related matter pending in the Western District of Texas.  In any event, the pragmatic analysis required by the Fifth Circuit precludes disqualification where, as here, these facts and other measures already in place can avoid any *legitimate* concern by Maxell.  Accordingly, DLA respectfully requests that Maxell's motion be denied.

**FACTUAL BACKGROUND**

### A.    DLA Implemented An Ethical Screen <u>Before</u> It Was Retained In This Case.

Mr. Park joined DLA in January 2020 from Mayer Brown, where he had performed some legal work for Maxell.  Ex. 2 (Park) ¶ 3.  Since joining DLA, Mr. Park has neither worked on any matter for Apple nor communicated with any DLA lawyers or paralegals representing Apple about any substantive aspect of any dispute between Maxell and Apple.  *Id.* ¶ 4; Ex. 1 (Cunningham) ¶ 7; Ex. 6–36 (App. Team Cons.) ¶¶ 4–7.  In fact, his only conversation touching on Maxell or its team at all involved a brief statement to a friend that Maxell's counsel were good lawyers.  Ex. 2 (Park) ¶ 6.

On July 30, 2020, Mr. Park joined DLA's notice of appearance on July 28 in an ITC matter Maxell had initiated against Apple.  *Id.* ¶ 8.  Mr. Beaber assured Mr. Park that Maxell had no intention of seeking to disqualify DLA.  *Id.*  Mr. Beaber and Mr. Park agreed that Mr. Park should ask DLA to establish an ethical wall.  *Id.* ¶ 8.  Mr. Park contacted Mark Fowler, U.S. Vice

Chair of the Intellectual Property and Technology practice group at DLA, that same day to alert him to that discussion. *Id.* ¶ 9. Moreover, Mr. Park already understood upon his arrival at DLA that matters he had worked on at Mayer Brown were confidential and should not be discussed with DLA personnel unless the client and the matter followed him to DLA. *Id.* ¶ 8.

Mr. Park and the OGC's Peter Lindau communicated that same day; Mr. Park understood he should not to talk to anyone on the Apple team about Maxell, and he did not do so. Ex. 3 (Lindau) ¶ 4; Ex. 2 (Park) ¶ 9. Mr. Lindau then initiated the process at DLA for the creation of an ethical screen, which was finalized on August 18, 2020. Ex. 3 (Lindau) ¶¶ 4–5. This was *before* DLA was retained by Apple for this case. Ex. 1 (Cunningham) ¶ 5; Ex. 10, 14, 24, 27–31(App. Team Cons.) ¶ 7.

This completed what Mr. Beaber had requested; he never requested any further response from Mr. Park. Ex. 2 (Park) ¶ 10. Indeed, Mr. Beaber and Mr. Park had a personal text exchange on August 10, in which Mr. Beaber never referenced Apple or Maxell at all, though Mr. Park did volunteer that he had contacted "Fowler and the in house counsel re Chinese wall so we are good." Ex. 2 (Park) ¶ 10; Ex. A to Ex. 2.

On August 28, 2020, Apple retained DLA as its lead trial counsel in this case. Ex. 1 (Cunningham) ¶ 6. This was *after* DLA had implemented the ethical screen. Two weeks later, Mr. Beaber revived the matter in a letter to DLA. Ex. 3 (Lindau) ¶ 6. Notably, his letter began by complaining about a conflict issue Apple's prior counsel had raised where a current member of Maxell's Mayer Brown team had previously represented Apple, thereby revealing the retributive nature of this motion. Over the next six weeks, DLA provided considerable information to Mayer Brown to allay Maxell's purported concerns, including a declaration by Mr. Park testifying to his lack of involvement in any matter for Apple, the undisputed fact that he never shared Maxell confidences with anyone on the Apple team, and the ethical screen. Ex. 3 (Lindau) ¶¶ 6–12; Exs. A–E to Ex. 3.

DLA's uncontroverted evidence to substantiate these points is considerable. Mr. Park has not

had any meetings or communications with Apple.  Ex. 2 (Park) ¶ 4.  He has never discussed with anyone on the Apple team or at DLA (other than OGC's Charles Deem and Mr. Lindau, and even then, nothing substantive) anything related to his previous work for Maxell.  *Id.* ¶¶ 4, 12; Ex. 3 (Lindau) ¶¶ 4–5, 9; Ex. 4 (Deem) ¶¶ 4, 7.  He has not disclosed any confidential or privileged Maxell information.  Ex. 2 (Park) ¶ 5.  And each lawyer and paralegal on DLA's Apple team adverse to Maxell has corroborated this under oath.  Ex. 1 (Cunningham) ¶¶ 5, 8; Ex. 6–36 (App. Team Cons.) ¶¶ 4–7.  In fact, nobody on the DLA Apple team works in Washington, D.C., where Mr. Park works, even putting aside the fact that DLA's offices have been closed since March due to the pandemic.  Ex. 1 (Cunningham) ¶ 12; Ex. 6–36 (App. Team Cons.) ¶ 2; Ex. 2 (Park) ¶ 2.

### B.  DLA Later Learned That <u>Mayer Brown</u> Included Seven Maxell-Related Emails In The Files Of A <u>Different</u> Client Who Followed Mr. Park To DLA As Part Of An Electronic Transfer To DLA Via The Cloud.

In October 2020, Mr. Park decided to create an Outlook file folder to store his email communications with DLA's OGC.  To do that, he searched his email for, among other things, the keyword "Maxell."  In so doing, he discovered seven emails, some of which had attachments, that *Mayer Brown* previously had sent to DLA as part of the file transfer for a different client.  Ex. 2 (Park) ¶ 12.  Mr. Park did not review the emails; instead, he immediately provided them to Mr. Lindau and Mr. Deem and then deleted them from his email folder.  Ex. 2 (Park) ¶ 12; Ex. 3 (Lindau) ¶ 9; Ex. 4 (Deem) ¶ 4.  Mr. Lindau and Mr. Deem have fully secured their copies from anyone else at DLA pending this Court's determination of what DLA should do with them.  Ex. 3 (Lindau) ¶ 9; Ex. 4 (Deem) ¶¶ 4–5.

That Mr. Park unknowingly came into possession of those emails is undisputedly due to Mayer Brown's error.  The uncontroverted facts are that Mr. Park had requested from Mayer Brown case files for several clients that followed Mr. Park to DLA.  Ex. 2 (Park) ¶¶ 14, 15.  Mayer Brown compiled and sent those materials to DLA a month after Mr. Park's departure.  Ex. 2 (Park) ¶ 15.  Because Mr. Park could not access the transferred materials, he asked DLA's IT group to transfer them to a folder

on his computer, where they made up a separate collection of emails there.  Ex. 2 (Park) ¶¶ 15–16.

When Mr. Park's October 8 search of his emails for "Maxell" identified for the first time the seven

emails described above, he had never reviewed the entirety of any of those client files to inventory

what was in it.  Ex. 2 (Park) ¶ 13.  Accordingly, Mr. Park reasonably understood until October 8 that

the file Mayer Brown had sent was limited to documents for the clients that followed him to DLA

and no other former clients.  *Id.*

### C.    Apple Retained DLA To Serve As Its Lead Trial Counsel In This Case.

DLA assumed all lead trial responsibilities for this matter upon its retention in August, and by

October, DLA had devoted more than 3,000 hours to this effort on just this case.  Ex. 1 (Cunningham)

¶ 11.  DLA has handled all pretrial filings, the joint pretrial order, and nearly all of the dispositive and

other motions this Court heard for an entire day on October 8, 2020—where Mayer Brown sat silently

about this issue and its disqualification motion.  DLA has been immersed in trial preparation and

made myriad attendant strategic decisions in consultation with Apple—*e.g.*, crafting *voir dire*, the open-

ing statement, fact and expert witness examinations, designations of deposition transcripts and objec-

tions to Maxell's designations, and all other trial preparation tasks.  Ex. 1 (Cunningham) ¶¶ 10–13.

Significantly, the O'Melveny firm has not been meaningfully involved in any of this, much less

sufficiently to take over as lead trial counsel for a December 7 trial.  If DLA were unable to represent

Apple at trial, Apple would need to request a continuance to allow substitute trial counsel sufficient

time to prepare to serve as lead trial counsel in this complex matter.  To be clear, Apple wants none

of that nor the associated delay; in reality, it is *Maxell* that is effectively seeking the "delay" that it tries

to foist on Apple.  The trial setting is mere days from the filing of this Opposition, and all pretrial

work is complete as the parties work (with the added burden of COVID-19 restrictions) to complete

all pretrial tasks before the Thanksgiving holiday week.  It is impossible for any other law firm to take

over this late and keep the trial date.

## LEGAL STANDARD

Disqualification motions are substantive and are governed by federal law. *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995). Even where, as here, the Local Rules reference the Texas Disciplinary Rules (Local Rule AT-2), the Texas Rules "are not the sole authority governing a motion to disqualify." *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299 (5th Cir. 2009) (internal quotations omitted). Courts must consider "the ethical rules announced by the national profession in light of the public interest and the litigants' rights." *Id.* (internal quotations omitted). "The Fifth Circuit has recognized the ABA Model Rules of Professional Conduct (Model Rules) as the national standards to consider in reviewing motions to disqualify." *Id.*

"Depriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration." *U.S. Fire Ins.*, 50 F.3d at 1313. "[I]nflexible application of a professional rule is inappropriate because frequently it would abrogate important societal rights, such as the right of a party to his counsel of choice and an attorney's right to freely practice her profession." *Id.* Consideration of the potential prejudice to the parties resulting from disqualification therefore is of "paramount importance." *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-CV-276-F, 2011 WL 13201855, at *9 (N.D. Tex. Sept. 12, 2011).

The moving party bears the burden of proving that disqualification is warranted. *Soverain Software LLC v. CDW Corp.*, No. 6:07 CV 511, 2010 WL 1038731, at *1 (E.D. Tex. Mar. 18, 2010). The motion cannot be based on speculation. *BMO Harris Bank N.A. v. Novak Druce Connolly Bove & Quigg LLP*, No. CV H-17-1616, 2018 WL 7253967, at *2 (S.D. Tex. Feb. 22, 2018). It must contain *admissible evidence* proving the factual bases for disqualification. *Simmons v. Houston Cty., Texas*, No. 9:05-CV-82, 2006 WL 8440543, at *3–4 (E.D. Tex. Feb. 2, 2006) (rejecting disqualification where plaintiff "offer[ed] no evidence" and did "not submit documentation, pleadings or evidence"). "A severe remedy such as disqualification cannot be granted on generalities." *Soverain Software*, 2010 WL 1038731,

at *4.  Courts apply this "exacting standard" to "discourage the use of such motions as a dilatory trial tactic" and "to protect a party's right to counsel of choice."  *Biote Med., LLC v. Jacobsen*, No. 4:18-CV-866, 2020 WL 2813201, at *2 (E.D. Tex. May 29, 2020).  *See also Abney v. Wal-Mart*, 984 F. Supp. 526, 528 (E.D. Tex. 1997) (same); *Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 394 (N.D. Tex. 2013) (cautioning that "[d]isqualification motions may be used as 'procedural weapons' to advance purely tactical purposes") (quoting *In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992)).

## ARGUMENT

I.  **Absolutely No Confidences Have Been Disclosed, DLA At All Times Has Acted Appropriately And In Good Faith, And Maxell Has Failed To Prove Otherwise.**

Practical considerations govern disqualification motions under federal law.[1]  In 2009, the Fifth Circuit rejected any irrebuttable presumption of shared confidences.  *ProEducation*, 587 F.3d at 300, 303–04.  Indeed, the Court left open the possibility that "no presumption remains."  *Id.* at 304 n.7.  Thus, "under Fifth Circuit precedent, there is no established irrebuttable presumption a lawyer shares client confidences he possesses with other lawyers at his law firm."  *Nat'l Oilwell*, 60 F. Supp. 3d at 762–63.  Likewise, Model Rule 1.10(a)(2) expressly precludes automatic imputation of any conflict to an entire law firm in circumstances such as this case.  *See also Silicon Graphics Inc. v. ATI Techs., Inc.*, 741 F. Supp. 2d 970, 975–77 (W.D. Wis. 2010) (noting that "in recent years, attorney mobility and firm mergers have increased exponentially," and explaining that Model Rule 1.10 "generally permit[s]" screening so as to reconcile the goals of "client protection and lawyer mobility") (internal quotations omitted); ABA Standing Committee on Ethics & Professional Responsibility, Report to the House of Delegates, at 11 (Feb. 2009) (explaining that the amendment "permitting private lateral screening" is

---

[1]Maxell states in a footnote that Texas law creates an irrebuttable presumption that confidences are shared (Mot. at 9 n.5), even though its brief effectively concedes that Texas law does not control.  In federal court, even if there is a presumption, it is rebuttable.  *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 60 F. Supp. 3d 751, 762–63 (W.D. Tex. 2014).

"particularly timely" in light of changes in the legal marketplace, and noting that "restrictions on mobility affect the interests of other clients in being represented by the lawyer of their choice").

The uncontroverted evidence here confirms that no Maxell confidences were disclosed to DLA, Apple, or anyone else; DLA reasonably and timely isolated Mr. Park from every lawyer and paralegal representing Apple in any matter involving Maxell; *and* DLA otherwise fully complied with its obligations under Model Rule 1.10(a)(2).

### A.    The Uncontroverted Evidence Confirms That No Maxell Confidences Have Been Shared With Any Lawyer Representing Apple.

Mr. Park has testified under oath that he never disclosed any confidential or privileged information of Maxell to any lawyer representing Apple, that he knew he should not do so before he even arrived at DLA in January 2020, and he understood this when he communicated with Mr. Lindau on July 30, 2020.  Ex. 2 (Park) ¶¶ 8–9; Ex. 3 (Lindau) ¶ 4.  The DLA lawyers representing Apple have sworn that they never obtained, nor attempted to obtain, confidential Maxell information from Mr. Park, that Mr. Park never disclosed any confidential Maxell information to them, and that they never accessed, nor attempted to access, any documents Mayer Brown transmitted via the cloud to DLA. Ex. 1 (Cunningham) ¶¶ 5, 8; Ex. 6–36 (App. Team Cons.) ¶¶ 4–7.  DLA's Senior Manager for IT Services (David Hoofnagle) confirmed that none of those lawyers obtained the emails that are the basis of Maxell's motion.  Ex. 5 (Hoofnagle) ¶¶ 3–8.

By contrast, Maxell has "offer[ed] no evidence" and did "not submit documentation, pleadings or evidence" showing that Mr. Park disclosed any of Maxell's confidences.  *Simmons*, 2006 WL 8440543, at *3.  Maxell tries to suggest otherwise by raising a single, isolated conversation (which DLA disclosed to Maxell) in which Mr. Park, speaking about a topic completely unrelated to Maxell, merely remarked to a friend that Mr. Beaber and his team were "good lawyers."  Ex. 2 (Park) ¶ 6.  Mr. Park never disclosed any Maxell confidences in that conversation or otherwise, as the sworn testimony of the two participants confirms.  Ex. 2 (Park) ¶ 6; Ex. 29 (Patrick Park) ¶¶ 4–5.

Equally unavailing is Maxell's outrageous attempt to leverage *Mayer Brown's* mistaken inclusion of seven Maxell emails in the electronic file of a different client—a file that *Mayer Brown* transferred to DLA—based on a grossly misleading insinuation in paragraph 19 of Mr. Beaber's declaration. That carefully-crafted, *hearsay* paragraph plainly seeks to create the false impression, without actually stating, that Mr. Park asked his former assistant to place the Maxell emails in the email file folder of another client before he left Mayer Brown. Mr. Beaber's falsehood, which is parroted more aggressively in Maxell's brief (pp. 3, 11 & fns.3, 6), has been categorically denied by Mr. Park under oath—the only admissible evidence on this point. Ex. 2 (Park) ¶¶ 14–15. Indeed, Maxell's entire theory, which glaringly omits a declaration from the unnamed "assistant" Mr. Park allegedly "directed," is not credible because the alleged events occurred seven months *before* Apple retained DLA.

As soon as Mr. Park realized on October 8 that Mayer Brown had included these emails, the reasons for which Mr. Park has explained in great detail in his declaration, Mr. Park provided them to DLA's OGC, who promptly sequestered them as permitted by applicable law pending direction from the Court,[2] and then he promptly deleted them from his outlook folder. Ex. 2 (Park) ¶ 12; Ex. 3 (Lindau) ¶ 9; Ex. 4 (Deem) ¶ 4. DLA has confirmed that no member of DLA's Apple team accessed, or even attempted to access, those emails. Ex. 5 (Hoofnagle) ¶¶ 6–8; Ex. 4 (Deem) ¶¶ 5–6.

In short, courts will deny disqualification where, as here, "the evidence [was] uncontradicted that [the attorney] steadfastly continue[d] to refuse to discuss this case with any member of the [his law firm]," and where the movant "failed to show . . . that there is a reasonable possibility that some

---

[2] Contrary to Maxell's assertion, *see* Mot. at 1, 12, DLA was not obligated to return or destroy all copies of these documents. The Texas Rules and federal standards recognize that an attorney in receipt of privileged information *outside the context of formal discovery* may sequester the documents and refrain from using them until a court rules on their disposition. *See, e.g., In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998). *See also* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 442 (2006) (providing that a lawyer may return inadvertently sent materials, but is under no obligation to do so); Fed. R. Civ. P. 26(b)(5)(B) (providing that an attorney may "sequester" the documents).

specifically identifiable impropriety did in fact occur." *Lemaire v. Texaco, Inc.*, 496 F. Supp. 1308, 1310 (E.D. Tex. 1980). *See also id.* at 1311 (holding that disqualification would be "manifestly unfair" under such circumstances). Indeed, there is "no evidence of information actually being passed, the case remains untainted, and [Maxell] [has] not been prejudiced." *Levin v. Raynor*, No. 03cv4697 (GBD), 2004 WL 2937831, at *4 (S.D.N.Y. Dec. 17, 2004).

**B.**  **DLA Reasonably Screened Mr. Park From The Apple Team, Which Alternatively Rebuts Any Presumption Of Shared Confidences.**

Another method of establishing that no confidences have been shared is by means of an ethical screen. *See, e.g., Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 225 (6th Cir. 1988); *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 827 F. Supp. 2d 341, 346 (S.D.N.Y. 2011). There is no magic formula regarding the timing or nature of that screen. Comment 10 to Model Rule 1.0(k), for instance, suggests it should be erected "as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening." And the Rule itself defines "screened" as "the *isolation* of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are *reasonably adequate* under the circumstances to protect information *that the isolated lawyer is obligated to protect* under these Rules or other law." Model R. Prof. Cond. 1.0(k) (emphases added).

Mr. Park joined DLA in January 2020. Ex. 2 (Park) ¶ 3. DLA was retained in the ITC matter on July 28, 2020, and on this case on August 28, 2020. Ex. 1 (Cunningham) ¶¶ 4, 6. When Mr. Park joined DLA in January, he already knew that ethics rules precluded him from sharing any client confidences of any client (not just Maxell) unless they moved their files to DLA. Ex. 2 (Park) ¶ 9. Notably, because DLA had not been engaged by Apple adverse to Maxell at that time, there was no need for any screen, and DLA's OGC was unaware of Mr. Park's prior work for Maxell until July 30. Ex. 3 (Lindau) ¶ 4.

Much later, when Mr. Beaber of Mayer Brown called Mr. Park on July 30, Maxell admits Mr. Beaber knew DLA represented Apple when inquiring about a screen for the ITC matter. Mr. Beaber

also said he had no intention of seeking to disqualify DLA.  Ex. 2 (Park) ¶ 8.  That same day, Mr. Park communicated with Mr. Lindau from DLA's OGC and understood at that time (and even before then) that he was prohibited from disclosing any information he knew regarding Maxell or any Maxell matter to anyone representing Apple or otherwise.  Ex. 2 (Park) ¶ 9; Ex. 3 (Lindau) ¶ 4.  Also, on that same day, Mr. Lindau initiated the process for the creation of a formal screen.  Ex. 3 (Lindau) ¶ 4.

The formal screen was fully in place by August 18.  Ex. 3 (Lindau) ¶ 4.  This was *before* Apple retained DLA on August 28 as lead counsel in this case.  Thus, ten days before Apple hired DLA here, an ethical screen had been established that instructed the Apple trial team not to communicate with the DC-based Mr. Park about Maxell.  Ex. 3 (Lindau) ¶ 4; Ex. 2 (Park) ¶¶ 9 and 11; Ex. 1 (Cunningham) ¶¶ 5, 6; Ex. 10, 14, 24, 27–31(App. Team Cons.) ¶ 7.  Both *before* and *after* that date, no such communications occurred.  Ex. 2 (Park) ¶ 11; Ex. 1 (Cunningham) ¶ 5; Ex. 6–36 (App. Team Cons.) ¶¶ 4–7; Ex. 5 (Hoofnagle) ¶¶ 3–8.[3]

Maxell says DLA implemented the screen too slowly in August, even though (1) DLA had not yet been hired for this case; (2) the screen for the ITC matter pre-dates this case; and (3) Maxell has not notified the courts of any of this in the ITC or Western District of Texas matters.  Ex. 1 (Cunningham) ¶¶ 6, 16.  Moreover, Maxell ignores that its claim here is not focused on Mr. Park's access to Apple's confidences, but rather the Apple team's access to Maxell's confidences that Mr. Park might know.  But even at the outset of the ITC matter, Mr. Park effectively had been screened from the Apple team based on his understanding of the ethics rules, which was reinforced by his communication with Mr. Lindau on July 30.  Ex. 3 (Lindau) ¶ 4; Ex. 2 (Park) ¶¶ 8–9.  And that screen plainly was effective, because nobody on the Apple team ever spoke with Mr. Park about Maxell.  Ex. 2 (Park) ¶¶ 7–8; Ex. 1 (Cunningham) ¶¶ 5–8; Ex. 6–36 (App. Team Cons.) ¶¶ 4–7.

---

[3]  The screen was supplemented on September 11 and periodically thereafter to reflect DLA's retention in this matter and the addition of other people to the Apple team.  Ex. 3 (Lindau) ¶ 5.

Courts repeatedly have denied disqualification motions even where implementation of the screen was delayed by several months. *See, e.g., Sailsbery v. Vill. of Sauk Vill.*, No. 15 C 10564, 2017 WL 5885323, at *3 (N.D. Ill. Nov. 28, 2017) (denying disqualification where law firm "put the ethical wall in place after [the former client filed a] motion to disqualify" because there was no sharing of confidences in the interim); *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936 KMW, 2011 WL 672254, at *5–6 (S.D.N.Y. Feb. 22, 2011) (denying disqualification where screen was implemented seven weeks after discovery of possible conflict and where a screening memorandum was circulated three months after such discovery); *Reilly v. Computer Assocs. Long-Term Disability Plan*, 423 F. Supp. 2d 5, 12–13 (E.D.N.Y. 2006) (denying disqualification where screen was implemented one month after discovery of possible conflict); *In re Del-Val Fin. Corp. Sec. Litig.*, 158 F.R.D. 270, 274 (S.D.N.Y. 1994) (denying disqualification where screen was implemented two months after the conflict arose).

The conclusion that DLA's screen was adequate is particularly appropriate because one of the relevant factors is the size of the law firm and thus the likelihood of contact between the screened parties. *Cromley v. Bd. of Educ. of Lockport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1069 (7th Cir. 1994). DLA is one of the largest law firms in the world, with nearly 4,000 attorneys. Ex. 1 (Cunningham) ¶ 2. Moreover, the attorneys on the Apple matter working on this case and the ITC matter live and work in California or Texas, while Mr. Park is in Washington, DC. Ex. 1 (Cunningham) ¶ 12.

### C.   DLA Provided To Maxell Adequate Notice of Its Representation of Apple.

Maxell cannot genuinely dispute it had notice of DLA's representation of Apple in the ITC matter, which is not particularly relevant in *this* case in any event. DLA was engaged to represent Apple in the ITC matter on July 28. Ex. 1 (Cunningham) ¶ 4  Maxell learned of DLA's representation only two days later when DLA filed a Public Interest Statement on July 30 and concurrently served a copy on Maxell's counsel. Ex. 1 (Cunningham) ¶ 4. That same day, Mr. Beaber called Mr. Park, who confirmed that he was not working on the ITC matter. Ex. 2 (Park) ¶ 8.Mr. Park had not disclosed

and would not disclose anything regarding Maxell. *Id.* Mr. Park responded to Mr. Beaber's text on August 10 and confirmed that he already had contacted DLA's OGC regarding an ethical wall. Ex. 2 (Park) ¶ 10. Finally, on August 29, DLA formally appeared in this case, one day after it was retained.

Shortly thereafter, on September 16, 2020, DLA assured Mayer Brown in writing that Mr. Park had not disclosed any of Maxell's confidences to any attorneys representing Apple, and that they neither sought nor received any information from Mr. Park about Maxell or any Maxell matters. Ex. 3 (Lindau) ¶ 6; Ex. A to Ex. 3. DLA also advised Maxell of the ethical wall it had erected (which Mr. Beaber already knew was in process from Mr. Park's August 10 text message to him). Ex. 2 (Park) ¶ 10; Ex. A to Ex. 2; Ex. 3 (Lindau) ¶ 6; Ex. A to Ex. 3. DLA's communications and correspondence with Maxell's counsel fully satisfied its obligations under Model Rule 1.10(a)(2)(ii), notwithstanding Maxell's contrived complaints about a "formal" response. The fact that Maxell waited more than two months to raise any concerns with this Court—despite appearing at an all-day hearing on October 8 and saying nothing—confirms that this argument is based on tactical rather than legitimate concerns.

### D.   DLA Certified, And Is Willing To Certify, Its Ongoing Compliance.

DLA already assured Maxell that no disclosure of confidential information has occurred and that an ethical screen is in place. Ex. 3 (Lindau) ¶ 6; Ex. A to Ex. 3. DLA did so again on September 28, 2020, including providing declarations from Mr. Park and Mr. Cunningham. *Id.* ¶ 7, Ex. B to Ex. 3. DLA also offered "to provide certifications, in the form of declarations from Mr. Park and from a member of the DLA Piper Apple team, at reasonable intervals upon Maxell's request." *Id.* DLA remains willing to do so. This is more than sufficient under Model Rule 1.10(a)(2)(iii).

## II.   Disqualifying DLA Would Be Inequitable And Highly Prejudicial To Apple.

"In light of the 'severity of disqualification,' the Fifth Circuit has cautioned courts not to 'apply disqualification rules "mechanically,"' and many courts have weighed a number of equitable considerations before taking the extraordinary action of disqualifying counsel." *Gen. Elec.*, 2011 WL 13201855,

at *8 (quoting *ProEducation*, 587 F.3d at 300 (internal quotations omitted)).  One paramount consideration is "the prejudice to the parties, including the extent of actual or potential delay in the proceedings."  *Id.* at *9 (internal quotations omitted).

Here, the prejudice to Apple would be enormous if DLA were disqualified at this late date. Over the last 90 days, more than a dozen DLA attorneys have invested more than 3,000 hours preparing this case for trial.  Ex. 1 (Cunningham) ¶ 11.  Among other things, DLA prepared Apple's pretrial disclosures (including deposition designations and objections), exhibit lists and objections, and witness lists; argued motions for summary judgment; drafted the Joint Final Pretrial Order and proposed jury instructions; and drafted motions *in limine* on behalf of Apple and responses to Maxell's motions *in limine*.  *Id.* ¶¶ 10, 13.  DLA also prepared Apple's opening statement and direct and cross examination strategies and outlines for fact and expert witnesses, all of which implement the trial strategy DLA has painstakingly developed for and with Apple.  *Id.* ¶¶ 10, 13–14.

Significantly, the O'Melveny firm has not been meaningfully involved in trial preparation, much less sufficiently to take over as lead trial counsel.  *Id.* ¶ 14.  Disqualifying the skilled and deeply invested trial attorneys at DLA, even though none has ever been privy to Maxell's confidential information, would rob Apple of its chosen lead trial counsel just days (and the Thanksgiving holiday) between the filing of this Opposition and the trial setting, causing undue prejudice.  It would also severely jeopardize the prospects for a mediation set for November 18.  *Id.* ¶ 15.

Apple would be forced to retain new lead counsel, who then would need to review nearly two years of filings, depositions, and written discovery.  Moreover, given the "complicated nature of [this] litigation," disqualifying DLA inevitably would necessitate a trial continuance, "caus[ing] even further delay, to the great disadvantage of the public, the parties, and the judicial system."  *Gen. Elec.*, 2011 WL 13201855, at *11.  *See also U.S. Fire*, 50 F.3d at 1316.

Courts repeatedly have denied disqualification motions in similar situations.  In *General Electric*, for instance, Judge Furgeson denied such a motion filed "at an advanced stage" of the litigation, based in part on the "significant prejudice" that disqualification would cause to General Electric, "which appears . . . to be an innocent victim of a lateral career move of lawyers involved in this case." *Gen. Elec.*, 2011 WL 13201855, at \*9–10.  The court found that "[d]isqualifying [counsel] at this stage would substantially prejudice [General Electric] by depriving the company of the superior skills, advanced technical knowledge, and unique perspective its chosen counsel has gained throughout the course of this particularly complex litigation," and that the "additional delay" that disqualification would cause "strongly disfavors disqualification." *Id.* at \*10–11.  *See also Nat'l Oilwell*, 60 F. Supp. 3d at 768 (denying motion to disqualify based in part on the "significant prejudice" that disqualification would cause because the defendant would "have to hire" new counsel and the "newly-hired lawyers would inevitably rack up substantial legal fees"); *Arista Records*, 2011 WL 672254, at \*8 (denying motion to disqualify based on the "significant hardship that disqualification would place on Defendants" where there was "a lack of meaningful showing that the trial process here will be tainted in any way") (internal quotations omitted); *Carbo Ceramics, Inc. v. Norton-Alcoa Proppants*, 144 F.R.D. 158, 164 (N.D. Tex. 1994) (denying disqualification motion on the eve of trial where "[d]isqualification would not only deprive Defendants of their counsel of choice but would require the expenditure of additional fees were Defendants required to retain new counsel").

In sum, disqualification would cause significant and unwarranted prejudice to Apple, especially given the uncontroverted evidence that Maxell's confidential information has not been disclosed.

## CONCLUSION

For the reasons stated herein and in DLA's supporting declarations, Maxell's motion to disqualify should be denied.

DATED:  November 9, 2020

Respectfully submitted,

/s/ John T. Cox III
John T. Cox III
SBN 05606300
Ashley E. Johnson
SBN 24067689
Scott K. Hvidt
SBN 24097864
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone:  (214) 698-3100
Facsimile:  (214) 698-3400
tcox@gibsondunn.com
ajohnson@gibsondunn.com
shvidt@gibsondunn.com

Kevin S. Rosen  (pro hac vice pending)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:   213.229.7000
Facsimile:     213.229.7520
krosen@gibsondunn.com

**ATTORNEYS FOR DLA PIPER LLP (US)**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of November, 2020, a true and correct copy of the fore-going brief was served via the Court's CM/ECF System upon all counsel of record.

*/s/John T. Cox III*
John T. Cox III