IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| MAXELL, LTD., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO.  5:19-CV-00036-RWS |
| | § | |
| v. | § | |
| | § | |
| APPLE INC., | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court is Plaintiff Maxell, Ltd.'s Motion to Disqualify DLA Piper LLP (US) (Docket No. 554) and DLA Piper's Motion to Strike Certain Portions of Jamie B. Beaber's Declaration in Support of Maxell's Motion to Disqualify (Docket No. 577).  For the reasons set forth below, both motions are **DENIED**.

## BACKGROUND

Maxell filed its initial complaint in this action on March 15, 2019, alleging that Apple's products infringe ten smartphone-related patents.[1]  Docket No. 1.  The case has since been narrowed to six patents and, after being reset twice, is currently set for trial on March 22, 2021.  Docket Nos. 593, 619, 624.  Maxell filed the instant motion on October 28, 2020—at the time, less than six weeks before the previous trial date, December 6, 2020.  Docket No. 554.  The Court heard argument on the motion following the pretrial conference on November 12, 2020 (Docket No. 582).

---

[1] U.S. Patent Nos. 6,748,317; 6,580,999; 8,339,493; 7,116,438; 6,408,193; 10,084,991; 6,928,306; 6,329,794; 10,212,586; and 6,430,498.

The events that form the factual background of this motion are generally undisputed, but each party's interpretation of the events is heavily contested.  Maxell and DLA Piper have each submitted declarations and documentary evidence in support of their interpretation.  The factual allegations in Maxell's motion are supported by the declaration of Jamie Beaber (Docket No. 554-1, Ex. A ("Beaber Decl.")), counsel for Maxell from Mayer Brown.  The facts alleged in DLA Piper's response are supported by the declaration of Justin Park (Docket No. 576-2, Ex. 2 ("Park Decl.")), the attorney whose actions are central to this motion, declarations of members of DLA Piper's Office of General Counsel ("OGC") (Docket No. 576-3, Ex. 3 ("Lindau Decl."), Docket No. 576-4, Ex. 4 ("Deem Decl.")), the declaration of David Hoofnagle, Senior IT Manager for DLA Piper (Docket No. 576-5, Ex. 5 ("Hoofnagle Decl.")) and declarations of each lawyer and paralegal on DLA Piper's Apple team adverse to Maxell (Docket No. 576-1, Ex. 1 ("Cunningham Decl."); Docket Nos. 576-6–36, Exs. 6–36 ("Apple Team Decls.")).  The following is a timeline of relevant facts.

## I.      Justin Park's Time at Mayer Brown

Maxell alleges that from April 2016 to January 2020, Justin Park worked on smartphone matters for Maxell as counsel at Mayer Brown and was an integral part of the Maxell litigation team.  Docket No. 554 at 2.  Through his work on Maxell matters, Maxell states that Mr. Park:

> (1) Accessed and had full access to all of Maxell's highly confidential business, technical, and attorney-client privileged information and documents, (2) was on the internal and external e-mail distribution lists for these cases where hundreds of confidential e-mails both within Mayer Brown and with Maxell were exchanged, (3) attended meetings with Maxell related to this case including at the client's headquarters in Japan, (4) attended numerous depositions relating to the Maxell smartphone matters, (5) has direct knowledge of Maxell's litigation strategy (which includes again privileged attorney mental impressions and work product), and (6) saw confidential and attorney-client information, technical and strategic, related to these cases (and the Apple matters specifically).

Beaber Decl. ¶ 3.  Mr. Park agrees that Maxell was one of his clients while at Mayer Brown.  Park Decl. ¶ 3.  In January 2020, Mr. Park left Mayer Brown and began working in the Washington, D.C. office of DLA Piper.  Beaber Decl. ¶ 4; Park Decl. ¶ 3.  At the time, DLA Piper was not engaged by Apple in this matter or in the related International Trade Commission ("ITC") matter adverse to Maxell—*Certain Mobile Electronic Devices and Laptop Computers*, Inv. No. 337-TA-1215.  Beaber Decl. ¶ 4.

Six months later, that changed.  On July 30, 2020, DLA Piper filed a Public Interest Statement on Apple's behalf in the ITC matter.  *Id.*  That same day, Mr. Beaber reached out to Mr. Park via telephone to discuss DLA Piper's management of any potential conflicts of interest involving Mr. Park.  *Id.* ¶ 5; Park Decl. ¶ 8.  Mr. Beaber's declaration refers to this conversation as a request for "a formal response regarding whether any confidential Maxell information had been disclosed to anyone on the DLA Piper Apple litigation team adverse to Maxell and whether any efforts were undertaken to protect Maxell's confidential information at that time."  Beaber Decl. ¶ 5.  Mr. Park characterizes the conversation as an informal call between former colleagues.  Park Decl. ¶ 8.  According to Mr. Park, Mr. Beaber told him that "Maxell had no intention of seeking to disqualify" DLA Piper and agreed that Mr. Park should ask the firm to establish an ethical wall.  *Id.*

During their conversation, Mr. Beaber claims Mr. Park informed him that he had "had discussions with at least one DLA Piper team member working on the matters adverse to Maxell regarding the attorneys at Mayer Brown working on the Maxell smartphone matters."  Beaber Decl. ¶ 5.  Mr. Park concedes that on July 28, 2020—two days prior to his conversation with Mr. Beaber—he spoke with Patrick Park, a DLA Piper attorney in Los Angeles whom he considers a personal friend.  Park Decl. ¶ 6.  But Mr. Park states that the "discussions" Mr. Beaber refers to

were innocuous; during "a brief portion of what was otherwise a personal conversation," Patrick Park asked him if he knew Mr. Beaber, and Mr. Park responded that Mr. Beaber and his team "were good lawyers."  *Id.*  Mr. Park testifies that he did not disclose any confidential client information to Patrick Park at that time or at any other time.  *Id.*

In response to his conversation with Mr. Beaber, Mr. Park emailed Mark Fowler, vice chair of his practice group at DLA Piper, regarding an ethical wall.  *Id.* ¶ 9; Docket No. 576-13, Ex. 13 ("Fowler Decl.") ¶ 4.  Mr. Fowler forwarded that email to Peter Lindau, a member of the firm's Office of General Counsel ("OGC").  Park Decl. ¶ 9; Fowler Decl. ¶ 5; Lindau Decl. ¶ 4.  Before that email, DLA Piper's OGC was unaware of Mr. Park's prior work for Maxell.  Lindau Decl. ¶ 4.  Mr. Lindau informed Mr. Park that he could not speak with anyone working on the ITC matter about Maxell or disclose any information about Maxell to anyone representing Apple.  Park Decl. ¶ 9; Lindau Decl. ¶ 4.  Mr. Park states that he always knew of these ethical obligations and complied with them at all times.  Park Decl. ¶ 9.

On August 10, 2020, Mr. Beaber testifies that Mr. Park "responded informally" to his inquiry and said that he had contacted Mr. Fowler and OGC about implementing an ethical screen. Beaber Decl. ¶ 6.  Mr. Park provided no further details regarding the ethical screen's timing or scope.  *Id.*  Mr. Park testifies that this exchange was part of a text conversation initiated by Mr. Beaber about unrelated, personal matters, and he had let Mr. Beaber know that he "contacted Fowler and the inhouse counsel re Chinese wall so we are good [sic]."  Park Decl. ¶ 10; Ex. A (text exchange between Mr. Park and Mr. Beaber dated 8/10/20).  Because the conversation continued regarding personal matters without a response from Mr. Beaber regarding the ethical wall, Mr. Park assumed that no further communications were necessary on the topic.  *Id.*

On August 18, 2020, Mr. Park testifies that he received a formal ethical screen notification from OGC. *Id.* ¶ 11. Although Mr. Park maintains that he was well aware of his duties under the ethical rules prior to reviewing the notification, he testifies that the ethical screen mandated that he (1) have no communications with any member of the DLA Apple team related to Maxell; (2) not work on anything related to his previous work for Maxell; (3) not have access to any case files, physical or electronic, for any matter involving Apple and Maxell; and (4) not receive any information about any matter involving Apple and Maxell from any of Apple's counsel, including any member of the DLA Apple team. *Id.* Mr. Lindau confirms that the ethical screen was "fully implemented" by August 18, 2020. Lindau Decl. ¶ 4.

On August 28, 2020, a number of DLA Piper attorneys entered appearances in this matter. Docket Nos. 512–22, 524, 529. Because he "had not yet received a formal response" to his request to Mr. Park on July 30 regarding an ethical screen, Mr. Beaber states that he was "surprised" at DLA Piper's appearance in this matter. Beaber Decl. ¶ 7. He then initiated the first in a series of communications between Mayer Brown and DLA Piper that began on September 11, 2020. *Id.*

## II.    Communications Between Mayer Brown and DLA Piper

On September 11, 2020, Mr. Beaber sent a letter to DLA Piper's opposing counsel and OGC "stating that DLA Piper's representation of Apple in this case raises a conflict of interest that may require disqualification and renewing my request for information regarding the protection of Maxell's highly confidential information." *Id.*; Docket No. 554-2, Ex. B (Sept. 11, 2020 email from Jamie Beaber to Sean Cunningham and Elisha King). The letter specifically asked DLA Piper to describe in detail (1) Mr. Park's role in the case, if any; (2) any actions that DLA Piper took to notify Maxell of this potential conflict of interest and to protect Maxell's confidential

information; and (3) the scope and parameters of any ethical screen implemented with respect to

Mr. Park.  *Id.*

On September 16, 2020, DLA Piper responded that it did not believe it had a disqualifying

conflict of interest in this case as Mr. Park had not disclosed any Maxell confidential information

to anyone on DLA Piper's Apple team and an ethical screen was in place.  Docket No. 554-3, Ex.

C (Sept. 16, 2020 email from Peter Lindau to Jamie Beaber).  DLA Piper also expressed concerns

that the purported issue was tactical in nature.  *Id.*  It then described the ethical screen:

> Justin Park has not disclosed any information regarding Maxell or any matter for
> Maxell in which he may have been involved ("the Maxell Matters") to anyone
> representing Apple. The lawyers representing Apple in the cases cited above have
> neither sought nor received any information from Mr. Park regarding Maxell or the
> Maxell Matters.
>
> DLA Piper erected an ethical wall, and separately reiterated to Mr. Park that he is
> prohibited from disclosing any information he may have regarding Maxell or the
> Maxell Matters to anyone representing Apple. The lawyers representing Apple
> have been advised that they may not seek or attempt to access any confidential
> information regarding Maxell or the Maxell Matters. If anyone were to attempt to
> breach the wall, even inadvertently, the Office of General Counsel would be
> notified. We have not received any such notification.

*Id.*

Mayer Brown responded on September 18, 2020, rejecting the contention that the concerns

were "tactical."  Docket No. 554-4, Ex. D (Sept. 18, 2020 email from Jamie Beaber to Peter

Lindau).  The response informed DLA Piper that it had not complied with ABA Model Rule

1.10(a)(2)(ii), which requires prompt written notice of a firm's compliance with Model Rule

1.10(a)(2)(i) (screening of a disqualified attorney), including a description of the screening

procedures employed and a statement of the firm's compliance.  *Id.*  It also noted that Mr. Park's

"discussions" with a member of the Apple Team regarding Mayer Brown and its work on the

Maxell smartphone matters raised confidentiality concerns.  *Id.*

On September 28, 2020, DLA Piper responded, stating that the firm had fully complied with its ethical obligations.  Docket No. 544-5, Ex. E (Sept. 28, 2020 email from Peter Lindau to Jamie Beaber).  DLA Piper stated that "Mayer Brown, and thus Maxell, were aware of the Firm's representation of Apple in the ITC matter upon or shortly after the filing of the Public Interest Statement with the ITC on July 30, 2020."  *Id.*  This is confirmed, DLA Piper claimed, by Mr. Beaber's conversation with Mr. Park on July 30 regarding an ethical screen.  *Id.*  DLA Piper then described the ethical screening procedures in greater detail:

> The initial ethical screen relating to the ITC matter was initiated immediately after your July 30, 2020 call with Mr. Park, and was fully implemented on or before August 18, 2020. Moreover, no confidential information had been communicated by Mr. Park to anyone at DLA Piper, including those professionals assisting in the representation of Apple, before the ethical screen was erected. And no such information has been communicated by Mr. Park to anyone at DLA Piper since that time. At the time the ethical screen was initiated, the Firm had not yet been retained by Apple on the matter pending in the Eastern District of Texas referenced above. A screen for that matter was automatically initiated upon our retention by Apple and the opening of that matter, and notification of the screen was sent automatically to all members of the Apple team working on that matter—both attorneys and paralegals—who were not already subject to the existing ethical screen.

> The Firm's attorneys and paralegals working on the Apple matters and Mr. Park were advised of the erection of the screen and instructed that Mr. Park could not work on the Matters and should be denied access to any files, electronic or physical, relating to the Matters. The Apple team members were also instructed to have no communications with Mr. Park regarding the Matters. Moreover, Mr. Park was instructed to have no communications with the Apple team on the Matters as well. And he was explicitly denied access to any files, physical or electronic, maintained in connection with the Matters. The Firm's software prevents the lawyers and paralegals on opposite sides of a screen from accessing electronic documents. Further, as I previously advised, if anyone were to even attempt to breach the ethical screen, even inadvertently, the Firm's Office of General Counsel would be notified. To date, we have received no such notification.

*Id.*

DLA Piper attached the sworn declaration of Sean Cunningham, one of the lead attorneys for Apple in this matter, corroborating the above description and confirming that he had spoken

with each member of the DLA Piper Apple team. *Id.* Each confirmed that they had no communications with Mr. Park pertaining to any prior work he performed for Maxell. *Id.* Mr. Park also provided a sworn declaration, summarized in the response below:

> Mr. Park provides further confirmation of these facts in his attached declaration. **Mr. Park brought no confidential files or materials with him from Mayer Brown pertaining to Maxell**. And since joining DLA Piper, Mr. Park has not worked on any matters involving or adverse to Maxell, including the Matters at issue. He also confirms that he has not worked on any matters for Apple. Most importantly, Mr. Park confirms that he has not disclosed any confidential information that he purportedly learned while representing Maxell to anyone at the Firm, including members of the team of lawyers and paralegals representing Apple. And he has never been asked by anyone at the Firm to disclose any such information.

*Id.* (emphasis added). The response closed with an assurance that DLA Piper would follow up with Mr. Park and the Apple team periodically to ensure the efficacy of the ethical screen and offered to provide certifications at reasonable intervals upon Maxell's request. *Id.*

On September 29, 2020, Mayer Brown responded, contending that DLA Piper's response was inadequate and that based on the firm's representations to date, "it remains clear that DLA Piper is in violation of the ethical rules."  Docket No. 554-6, Ex. F (Sept. 29, 2020 email from Jamie Beaber to Peter Lindau).  Specifically, Mayer Brown argued that: (1) DLA Piper did not provide Maxell or Mayer Brown with prompt and timely written notice as required by Model Rule 1.10(a)(2)(ii) of its representation of Apple in either this matter or the ITC matter; and (2) DLA Piper did not "timely screen" Mr. Park because the ethical screen was initiated after Mr. Beaber "raised the issue" with Mr. Park. *Id.* Mayer Brown requested a "comprehensive response" to these points by October 1, 2020. *Id.*

The next day, DLA Piper provided a brief response:

> In response to your letter of September 29, 2020, we have already provided declarations confirming that (1) an ethical wall was timely initiated, and (2) no

confidential or privileged information of your client was disclosed to the Apple
team. This should satisfy any legitimate concerns your client may have had.

Docket No. 554-7, Ex. G (Sept. 30, 2020 email from Peter Lindau to Jamie Beaber).

Dissatisfied with DLA Piper's response, on October 5, 2020, Mayer Brown sent another
email expressing Maxell's "serious concerns" due to DLA Piper's "conflicting information."
Docket No. 554-8, Ex. H (Oct. 5, 2020 email from Jamie Beaber to Peter Lindau).  The email
requested that DLA Piper immediately provide comprehensive responses to Maxell's concerns
regarding the timeliness of the ethical screen and written notice of DLA Piper's representation of
Apple.  *Id.*

A week passed, within which DLA Piper did not respond.  Mayer Brown then sent a notice
requesting DLA Piper's response or "a date and time you are available for a meet and confer on
Maxell, Ltd.'s motion to disqualify."  Docket No. 554-9, Ex. I (Oct. 12, 2020 email from Jamie
Beaber to Peter Lindau).

### III.    Discovery of Maxell's Confidential Materials

On October 14, 2020, DLA Piper responded.  Docket No. 554-10, Ex. J (Oct. 14, 2020
email from Peter Lindau to Jamie Beaber).  DLA Piper clarified that the "discussions" Mr. Park
had with a member of the Apple team was merely a casual interaction in which Mr. Park
acknowledged that he knows Mr. Beaber and complimented him and his team.  *Id.*

The response then stated that Mr. Park had recently created a consolidated folder of his
communications with OGC regarding the ethical screen.  *Id.*  In doing so, Mr. Park searched his
email for the term "Maxell."  *Id.*  That search uncovered several email threads pertaining to Maxell.
*Id.*  DLA Piper explains that Mayer Brown "erroneously included" the emails during Mr. Park's
transfer as part of a separate transferring client's files.  *Id.*  Until this time, DLA Piper maintains,

no one at DLA Piper, including Mr. Park, knew that he possessed the emails.  *Id.*  Mr. Park immediately forwarded the emails to OGC.  *Id.*

After the emails were discovered, DLA Piper states that its IT department conducted an investigation and concluded that none of the emails were accessed by anyone other than Mr. Park and OGC.  *Id.*  DLA Piper attached the Maxell emails to its response, stating that the "emails are now and will remain inaccessible to DLA Piper staff and lawyers, including Mr. Park, outside the Office of General Counsel."  *Id.*

Mayer Brown responded two days later, stating that the materials Mr. Park found in his files were "highly confidential Maxell case settlement strategies and royalty rates for the Maxell smartphone patent portfolio."  Docket No. 554-11, Ex. K (Oct. 16, 2020 email from Jamie Beaber to Peter Lindau).  The response argues that their belated discovery demonstrates that "[t]here was no plan or direction from DLA Piper to thoroughly search Mr. Park's files," calling into question the efficacy of the purported ethical wall.  *Id.*  Further, Mr. Park's previous declaration that he "brought no confidential files or materials with him from Mayer Brown pertaining to Maxell" was now, in Maxell's view, proven to be false.  *Id.*  In light of this new information, and in the absence of DLA Piper's comprehensive response requested in its previous emails, Mayer Brown informed DLA Piper that Maxell would be moving to disqualify.  *Id.*  Maxell filed its motion to disqualify DLA Piper on October 28, 2020.  Docket No. 554.

## LEGAL STANDARDS

### I.      Motions to Disqualify

"As disqualification is a procedural matter not unique to patent law, regional circuit law applies."  *Adaptix, Inc. v. Dell, Inc.*, No. 6:13-cv-437, 2014 WL 11730482, at *4 (citing *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 869 F.2d 578, 580–81 (Fed. Cir. 1989)).  In the Fifth Circuit, a

motion to disqualify is a substantive motion "affecting the rights of the parties" and is thus "determined by applying standards developed under federal law." *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) (quoting *In re Dresser Industries*, 972 F.2d 540, 543 (5th Cir. 1992)). While the Fifth Circuit is "sensitive to preventing conflicts of interest," it has warned that disqualification should not be applied "mechanically" or "cavalierly." *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299–300 (5th Cir. 2009) (citing *Am. Airlines*, 972 F.2d at 610; *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995)).

Rather, the Fifth Circuit has directed courts to carefully "consider '[a]ll the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.' " *Id.* at 300 (quoting *U.S. Fire*, 50 F.3d at 1314.); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976) ("A court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel."). To that end, courts are to consider a motion to disqualify "in light of the litigant's rights and the public interest, considering 'whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case.' " *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001) (citing *Dresser*, 972 F.2d at 543).

When deciding a motion to disqualify, a court first looks to that court's specific local rules. *U.S. Fire*, 50 F.3d at 1312.  In the Eastern District of Texas, "[t]he standards of professional conduct adopted as part of the Rules Governing the State Bar of Texas shall serve as a guide governing the obligations and responsibilities of all attorneys appearing in this court."  L.R. AT-

2(a).  District courts, however, are not limited to their local rules in deciding a motion to disqualify.
*Am. Airlines*, 972 F.2d at 610.   In fact, in reviewing motions to disqualify, courts must also
"consider the ethical rules announced by the national profession in light of the public interest and
the litigants' rights."   *Id.*   To this aim, the Fifth Circuit has acknowledged that the ABA Model
Rules of Professional Conduct (the "Model Rules") are the "national standards to consider in
reviewing motions to disqualify."   *ProEducation*, 587 F.3d at 299.   Therefore, the Court considers
both the Texas Rules and the Model Rules.

### II.     Relevant Ethical Rules

Model Rule 1.09 provides:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter
represent another person in the same or a substantially related matter in which
that person's interests are materially adverse to the interests of the former client
unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially
related matter in which a firm with which the lawyer formerly was associated
had previously represented a client
    (1) whose interests are materially adverse to that person; and
    (2) about whom the lawyer had acquired information protected by Rules
    1.6 and 1.9(c) that is material to the matter; unless the former client
    gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or
former firm has formerly represented a client in a matter shall not thereafter:
    (1) use information relating to the representation to the disadvantage of
    the former client except as these Rules would permit or require with
    respect to a client, or when the information has become generally
    known; or
    (2) reveal information relating to the representation except as these Rules
    would permit or require with respect to a client.

Texas Disciplinary Rule of Professional Conduct 1.09(a)–(b) provides:

(a) Without prior consent, a lawyer who personally has formerly represented a client
in a matter shall not thereafter represent another person in a matter adverse to the
former client:

(1) in which such other person questions the validity of the lawyer's services or work product for the former client;

(2) if the representation in reasonable probability will involve a violation of Rule 1.05; or

(3) if it is the same or a substantially related matter.

(b) Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

Both the Texas rules and Model Rules prohibit other lawyers from the disqualified attorney's firm from representing the conflicting client.  Tex. Disciplinary Rule of Prof'l Conduct 1.09(b); Model R. Prof. Conduct 1.10(a).  But the Model Rules allow for screening as a means of avoiding imputed conflicts under certain circumstances.  Model Rule 10(a)(2)(i)–(iii) provides:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless

(2) the prohibition is based on Rule 1.9(a) or (b) and arises out of the disqualified lawyer's association with a prior firm, and

(i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom;

(ii) written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures; and

(iii) certifications of compliance with these Rules and with the screening procedures are provided to the former client by the screened lawyer and by a partner of the firm, at reasonable intervals upon the former client's written request and upon termination of the screening procedures.

## DISCUSSION

Maxell moves to disqualify DLA Piper for failure to comply with the relevant ethical rules. Docket No. 554 at 9.  In its motion, Maxell argues that because (1) DLA Piper did not implement a timely and effective screen as required by Model Rule 1.10(a)(2)(i), and (2) DLA Piper did not provide Maxell with prompt written notice as required by Model Rule 1.10(a)(2)(ii), Mr. Park's conflict must be imputed to DLA Piper, disqualifying the firm from representing Apple in this case.  Docket No. 554 at 9, 13.

DLA Piper responds that no Maxell confidential information has been shared with any member of the firm and the firm reasonably screened Mr. Park from the Apple team.  Docket No. 576 at 8–12.  DLA Piper contends that Maxell had adequate notice of its representation of Apple and the firm is willing to certify its ongoing compliance with the ethical rules.  *Id.* at 12–13. Further, DLA Piper argues that disqualifying it at this stage of the case would be inequitable and highly prejudicial to Apple's trial preparations.  *Id.* at 13–15.

There is no dispute that (1) Mr. Park acquired confidential information in his representation of Maxell during his time at Mayer Brown; and (2) Mr. Park is now associated with DLA Piper, a firm that is representing the opposing side of a very active Maxell matter.  *Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936 KMW, 2011 WL 672254, at *5 (S.D.N.Y Feb. 22, 2011); Park Decl. ¶ 3.  The question for the Court is therefore whether Mr. Park's status as a disqualified attorney must be imputed to DLA Piper.

Conflicts are usually imputed to a disqualified attorney's firm based on the presumption of shared client confidences.  *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005).  Fifth Circuit and Texas law conflicts on whether this presumption is rebuttable. When a lawyer moves to another firm, Texas courts apply an irrebuttable presumption that the

lawyer shares confidences with its members, "requiring imputed disqualification of the firm." *In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 824 (Tex. 2010).  But "under Fifth Circuit precedent, there is no established irrebuttable presumption [that] a lawyer shares client confidences he possesses with other lawyers at his law firm." *Nat'l Oilwell*, 60 F.Supp.3d at 762 (citing *ProEducation*, 587 F.3d at 304 n.7).  Indeed, "to the extent there is still a presumption . . . the presumption is rebuttable." *Id.* at 763; *see also DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-cv-72-DF, 2009 WL 10679840, at *9 (E.D. Tex. Dec. 30, 2009), *aff'd, In re DataTreasury Corp.*, No. 2010-M928, 2010 WL 3074395 (Fed. Cir. 2010).

Because motions to disqualify are governed by the law of the regional circuit, the Court will not apply an irrebuttable presumption that Mr. Park shared Maxell's confidential information with other members of DLA Piper. [2]  *Adaptix*, 2014 WL 11730482, at *4 (citing *Picker*, 869 F.2d at 580–81).  Instead, DLA Piper may rebut any presumption that Mr. Park shared Maxell confidences with other DLA Piper attorneys based on the factual record.  *See Nat'l Oilwell*, 60 F.Supp.3d at 765–66, 767 n.11 (under Fifth Circuit law, the Court considers efforts to screen the disqualified attorney from the litigation as part of the factual record).  In considering the factual record, the Court follows the balancing approach deemed most prudent by many other courts in light of the Fifth Circuit's guidance as a whole.  *U.S. Fire*, 50 F.3d at 1313; *Cossette v. Country Style Donuts, Inc.*, 647 F.2d 526, 530 (5th Cir. 1981), *disavowed on other grounds by Gibbs v.*

---

[2] It is unclear whether Maxell argues that an irrebuttable presumption of shared confidences among attorneys should apply here.  Maxell notes that "[u]nder Texas law, efforts to screen conflicted attorneys through mechanisms like 'Chinese walls' cannot rebut the presumption of shared confidences among lawyers," appearing to argue Texas's irrebuttable presumption should apply. Docket No. 554 at 9, n.5 (quoting *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 60 F.Supp.3d 751, 767 n.11 (W.D. Tex. 2014)).  But Maxell also contends that Mr. Park's conflict of interest must be imputed to DLA Piper because it "did not implement a timely and effective ethical screen"—*i.e.*, DLA Piper failed to rebut the presumption of shared confidences. *Id.* at 9.

*Paluk*, 742 F.2d 181, 185 (5th Cir. 1984); *Woods*, 537 F.2d 804, 810 (5th Cir. 1976); *Adaptix*, 2014 WL 11730482, at *9; *DataTreasury*, 2009 WL 10679840, at *9; *Nat'l Oilwell*, 60 F.Supp.3d at 766.

      The Court will consider each of Maxell's grounds for disqualification in turn.  Because DLA Piper has moved to strike portions of Mr. Beaber's declaration from the factual record, the Court first considers the motion to strike.

## I.      DLA Piper's Motion to Strike

      DLA Piper moves to strike the following portions of Mr. Beaber's declaration for lack of personal knowledge and on hearsay grounds.  Docket No. 557 at 1–2.

> Beaber Decl., ¶ 2, last sentence: Mr. Park billed hundreds of hours on Maxell's smartphone matters, including many hours spent on matters adverse to Apple, drafting and reviewing documents and filings and attending strategy meetings.

> Beaber Decl., ¶ 3: During his time at Mayer Brown, Mr. Park has accessed and had full access to all of Maxell's highly confidential business information.  Mr. Park was intimately involved in the Maxell smartphone matters: he attended numerous depositions relating to the Maxell smartphone matters, has direct knowledge of Maxell's litigation strategy (which includes privileged attorney mental impressions and work product), attended meetings with Maxell related to this case including at the client's headquarters in Japan, was on the internal and external e-mail distribution lists for these cases where hundreds of confidential e-mails both within Mayer Brown and with Maxell were exchanged, and has seen confidential, technical and strategic information related to these cases (and in this case against Apple specifically), among others.

> Beaber Decl., ¶ 19: Two days before his departure from Mayer Brown, Mr. Park's assistant, at his direction, moved certain e-mail file folders from Mr. Park's Mayer Brown e-mail account into a database for one of his clients transferring to DLA Piper.  Without Maxell's or Mayer Brown's knowledge or consent, several highly confidential and attorney-client privileged documents concerning Maxell were within those e-mail file folders which are now at DLA Piper.

      Striking paragraphs 2 and 3, which describe the extent of Mr. Park's representation of Maxell, would be ineffectual: Maxell and DLA Piper do not disagree that Mr. Park was privy to

Maxell's confidential information and would not be eligible to represent Apple in this matter. *See* Docket No. 576 at 8; Park Decl. ¶¶ 3–5, 7–9.  Similarly, the parties do not dispute that "several highly confidential and attorney-client privileged documents concerning Maxell" contained in Mr. Park's email file folders for another client were at some point transferred to DLA Piper.  Docket No. 576 at 4; Park Decl. ¶ 12; Docket No. 590 at 156:14–159:2.

DLA Piper characterizes paragraph 19 of Mr. Beaber's declaration as "carefully crafted hearsay" providing a "grossly misleading insinuation" that Mr. Park purposely directed his assistant to transfer Maxell materials to DLA Piper.  Docket No. 576 at 9.  At the hearing on the motion to disqualify, Mr. Beaber clarified that there was no claim that Mr. Park purposely transferred Maxell confidential files to DLA Piper.  Docket No. 590 at 156:14–159:2.

> The Court:  But there's no evidence that the fact that material in his email files was anything other than inadvertent?
>
> Mr. Beaber:  Correct.

*Id.* at 158:24–159:2.

In any case, whether Maxell's materials were moved inadvertently by Mr. Park's assistant at his direction or by Mayer Brown as part of a client transfer is not dispositive to the Court's analysis.  Beaber Decl. ¶ 19; Park Decl. ¶ 12.  The Court does not view any discrete part of the factual record as dispositive, but rather considers the factual record as a whole as part of the balancing approach.  *Nat'l Oilwell*, 60 F.Supp.3d at 767.  Accordingly, DLA Piper's motion to strike is **DENIED**.

## II.   Whether DLA Piper implemented a timely and effective screen as required by Model Rule 1.10(a)(2)(i)

In reviewing the rebuttable presumption that Mr. Park shared Maxell's confidences with other DLA Piper attorneys, the Court considers DLA Piper's efforts to screen Mr. Park from the

Maxell matters. *Nat'l Oilwell*, 60 F.Supp.3d at 767 n.11. Maxell contends that these efforts were inadequate. Docket No. 554 at 9–10.

First, Maxell argues that DLA Piper's ethical screen was not timely because the firm "did not take any affirmative steps to implement an ethical wall when it first sought out this representation of Apple or when it was first retained to represent Apple in this case." *Id.* at 9. Maxell claims that the factual record shows that the ethical wall screening Mr. Park was not in place until weeks after Apple retained DLA Piper in the ITC matter and Mr. Beaber inquired about protections for Maxell's confidential formation. *Id.* at 10.

DLA Piper responds that the ethical screen was fully in place by August 18, 2020—before DLA Piper was retained by Apple in this matter. Docket No. 576 at 10–11. In DLA Piper's view, the factual record shows that Mr. Park was fully screened by August 18, as he had been instructed not to disclose any confidential Maxell information with anyone at the firm, and every member of the Apple team had been instructed not to communicate with Mr. Park about Maxell. *Id.* at 11; Park Decl. ¶ 9–11; Lindau Decl. ¶ 4; Cunningham Decl. ¶ 5–6; Apple Team Decls. ¶ 7. Indeed, the firm argues, Mr. Park was aware of his obligation to protect Maxell's confidential information before this time and had not shared any such information with anyone at DLA Piper. *Id.*; Park Decl. ¶¶ 8–9, 11. And DLA Piper notes that courts have repeatedly declined to disqualify firms even where ethical screening was delayed for several months. Docket No. 576 at 12.

While the Court recognizes that it was DLA Piper's "responsibility to detect the conflict of interest before" it engaged Apple as a client in matters adverse to Maxell, "the fact remains that as soon as [it] did discover the conflict, [it] immediately instituted screening devices." *In re Del-Val Fin. Corp. Sec. Litig.*, 158 F.R.D. 270, 274 (S.D.N.Y. 1994). "[F]lawed screens—including late screens—are not fatal," and screens "erected immediately upon discovery of the conflict weigh

against disqualification." *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 827 F.Supp.2d 341, 346 (S.D.N.Y. 2011).

The same day that Mr. Beaber contacted Mr. Park regarding his potential conflict, Mr. Park reached out to Mr. Lindau at OGC, who initiated the process of a formal screen. Park Decl. ¶ 9; Lindau Decl. ¶ 4. As of July 30, 2020, Mr. Park was informed that he could not disclose any information about Maxell to any other DLA Piper attorney. *Id.* By August 18, 2020, every DLA Piper Attorney working on the Apple matters had been instructed not to communicate with Mr. Park about Maxell. Cunningham Decl. ¶ 5–6; Apple Team Decls. ¶ 7. And each person involved in the Apple matters has sworn that no communications occurred either before or after that date. Park Decl. ¶ 11; Cunningham Decl. ¶ 5; Apple Team Decls. ¶ 4–7. To hold that DLA Piper's ethical screen was not timely because, at the latest, it was instituted three weeks after DLA Piper was engaged by Apple in the ITC matter would be an overly mechanical application of the professional rules. *U.S. Fire*, 50 F.3d at 1314.

Second, Maxell argues that DLA Piper's screening procedures, regardless of their timing, were ineffective. Docket No. 554 at 10–11. In doing so, Maxell points to two events: (1) Mr. Park's July 28, 2020 conversation with a member of the DLA Piper Apple team adverse to Maxell "regarding Mayer Brown's work for Maxell on the smartphone matters"; and (2) Mr. Park's discovery of confidential Maxell emails in October 2020. *Id.* Maxell contends that its confidential information is still at risk, as DLA Piper's OGC has maintained possession of the Maxell materials discovered in Mr. Park's files in violation of the Protective Order in this case and despite Maxell's request that all copies be returned or destroyed. Docket No. 554 at 12 (citing Docket No. 45 ¶ 16(b)).

Mr. Park testified that he has not disclosed any confidential or privileged information regarding Maxell to anyone at DLA Piper, including the Apple team in this matter, the ITC matter or a related matter in the Western District of Texas.  Park Decl. ¶ 5.  The conversation Maxell points to was, Mr. Park states, a personal conversation with a friend and fellow DLA Piper attorney, Patrick Park, in which Mr. Park told him that "Mr. Beaber and his team were good lawyers."  *Id.* ¶ 6.  During this conversation, Mr. Park unequivocally states, he did not communicate any confidential Maxell information or any substance at all regarding Maxell.  *Id.* This is corroborated by Patrick Park's declaration, in which he testifies that Mr. Park briefly mentioned Mr. Beaber and described him and his team as good lawyers, but did not discuss Maxell, Apple or any confidential information relating to either party.  Docket No. 576-29, Ex. 29 (Patrick Park Decl.) ¶¶ 4–5.

After Maxell's confidential emails were discovered, David Hoofnagle, Senior Manager of IT Services, investigated to determine whether anyone besides Mr. Park had accessed the emails or whether they had been forwarded to anyone else at the firm.  Docket No. 576-5, Ex. 5 (Hoofnagle Decl.) ¶ 3.  That investigation concluded that, besides the mailboxes of Mr. Park, OGC attorneys Mr. Deem and Mr. Lindau, and Mr. Hoofnagle and his IT team, the Maxell emails had never been in the email mailbox of any other DLA Piper employee.  *Id.* ¶ 4.  The IT investigation also found that Mr. Park had not taken any action with respect to the Maxell emails other than to access them briefly and then delete them on October 8, 2020.  *Id.*  Finally, the investigation confirmed that the confidential materials attached to the Maxell emails were not saved on DLA Piper's document management system or Mr. Park's cloud storage location, Microsoft One Drive. *Id.*

In light of this factual record, the Court cannot conclude that DLA Piper's screening procedures were ineffective—*i.e.*, that Maxell's confidential information was shared with any member of DLA Piper other than Mr. Park and OGC.  "[T]o question this factual record would essentially amount to concluding that these [36 lawyers and employees] are lying under oath as part of a conspiracy."  *Nat'l Oilwell*, 60 F.Supp.3d at 767.  Maxell argues that it has "received false declarations" regarding the efficacy of the ethical screen from DLA Piper in the past, such as when Mr. Park testified that he "brought no confidential files or materials with him from Mayer Brown pertaining to Maxell."  Docket No. 590 at 188:21–22; Docket No. 544-5, Ex. E (Sept. 28, 2020 email from Peter Lindau to Jamie Beaber) (citing attached declaration of Mr. Park).  Maxell's allegation that DLA Piper has previously provided "false declarations" asserts one of two possibilities: that DLA Piper's declarations are intentionally false or that DLA Piper has not diligently ensured the accuracy of these declarations.

To the extent that Maxell argues that the submitted declarations are intentionally false, the Court cannot conclude that three dozen attorneys and employees are colluding to present a false narrative to the Court.  *See Nat'l Oilwell*, 60 F.Supp.3d at 767.  Maxell clarified in its reply, as well as at the hearing, that it did not intend to "speculate about Mr. Park's state of mind" or insinuate that Mr. Park deliberately transferred Maxell's materials.  Docket No. 590 at 158:7–8; Docket No. 580 at 2.

Alternatively, to the extent that Maxell's concerns persist because DLA Piper "undertook no reasonable investigation to determine whether" it possessed any confidential Maxell information, those concerns can now be assuaged.  Docket No. 590 at 188:22–189:5.  DLA Piper has now provided exhaustive evidence demonstrating that no attorney working on any matters involving Apple or Maxell received or viewed any confidential Maxell information, as well as

sworn testimony confirming that Maxell's confidential materials were not accessed by any attorneys other than Mr. Park and OGC.  Apple Team Decls. ¶ 4–7 ; Hoofnagle Decl. ¶ 4.  In sum, the factual record indicates that Mr. Park did not share any of Maxell's confidences with DLA Piper attorneys, and none of Maxell's confidential materials were accessed by any DLA Piper attorney retained on matters adverse to Maxell.

Maxell argues that the facts weigh in favor of disqualification because Mr. Park works in the same office location and practice group as some of the attorneys on DLA Piper's Apple team, creating an "ongoing risk of future disclosure of Maxell's highly confidential information."  *Id.* at 13–14.  But the attorneys on the Apple matter in this case and the related ITC matter are located in California and Texas, while Mr. Park is located in Washington, D.C.  Docket No. 576-1, Ex. 1 (Cunningham Decl.) ¶ 12 ("None of the lawyers on the DLA Apple Team lives or works in Washington D.C.").  Contrary to Maxell's contentions, the low likelihood of contact between Mr. Park and the attorneys in this matter—particularly in light of DLA Piper's roster of nearly 4,000 attorneys—weighs against disqualification.  *Cromley v. Bd. of Educ. of Lockport Tp. High Sch. Dist. 205*, 17 F.3d 1059, 1069 (7th Cir. 1994).  "[E]ven before formal screening procedures were implemented, there was a clear physical distance separating" Mr. Park from the attorneys in this case that further satisfies any concerns that he may have passed along confidential information. *Reilly v. Computer Assocs. Long-Term Disability Plan*, 423 F.Supp.2d 5, 12 (E.D.N.Y. 2006). "The presumption of sharing, if one arises under these facts in the Fifth Circuit, has been clearly and effectively rebutted."  *Lemaire v. Texaco, Inc.*, 496 F.Supp. 1308, 1310 (E.D. Tex. 1980) (internal quotations omitted).

Finally, the equitable considerations here do not support disqualification.  "[M]any courts have weighed a number of equitable considerations before taking the extraordinary action of

disqualifying counsel," including courts in this district.  *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-cv-276-F, 2011 WL 13201855, at *8 (N.D. Tex. Sept. 12, 2011); *Adaptix*, 2014 WL 11730482, at *9–10; *DataTreasury*, 2009 WL 10679840, at *9–10.  A party's right to counsel of its choice is an "important societal right" that should not be revoked by an inflexible application of the ethical rules.  *U.S. Fire*, 50 F.3d at 1314.  Rather, the Court must carefully "consider '[a]ll the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.' "  *ProEducation*, 587 F.3d at 300 (quoting *U.S. Fire*, 50 F.3d at 1314).

When the instant motion was filed, the parties were weeks away from trial.  *See* Docket No. 593 (resetting jury selection and trial to March 22, 2021, from December 7, 2020).  At the time of this order, trial is again only weeks away.  DLA Piper attorneys prepared Apple's pretrial disclosures, exhibit lists and objections, witness lists, joint pretrial order and proposed jury instructions, motions *in limine* and responses to Maxell's motions *in limine* as well as other trial materials and presented argument at the dispositive motions hearing in October 2020.  Docket No. 576 at 14; *see* Docket Nos. 532, 539, 546, 548, 559, 563.  Since it was retained, DLA Piper has billed more than 3,000 hours preparing this case for trial—a number that has only grown since trial was delayed to March 2021.  Docket No. 576 at 14; Cunningham Decl. ¶ 11.  "To disqualify [DLA Piper] at this point would create a significant hardship" for Apple by removing the entirety of its legal team on the eve of trial.  *Evolutionary Intelligence*, 2013 WL 12140485, at *19 (quoting *Federal-Mogul World Wide, Inc. v. Mahle GMBH*, No. 11-10675, 2012 WL 834459, at *4 (E.D. Mich. March 13, 2012)).  This case—which has already seen its share of delays—would be further delayed while Apple searches for new counsel.  On balance, Maxell's concerns do not outweigh

Apple's right to choose its counsel or the considerations of efficient administration of justice. *DataTreasury*, 2009 WL 10679840, at *10.

### III.   Whether DLA Piper provided Maxell with prompt written notice of its representation of Apple as required by Model Rule 1.10(a)(2)(ii)

Maxell argues that "it is undisputed" that DLA Piper did not provide Maxell or Mayer Brown with prompt written notice of its representation of Apple in compliance with Model Rule 10(a)(2)(ii). Docket No. 554 at 13. Indeed, in DLA Piper's September 28, 2020 letter, it stated that "Mayer Brown, and thus Maxell, were aware of the Firm's representation of Apple in the ITC matter upon or shortly after the filing of the Public Interest Statement with the ITC on July 30, 2020." Docket No. 544-5, Ex. E (Sept. 28, 2020 email from Peter Lindau to Jamie Beaber). This, Maxell argues, does not remotely comport with the requirement that the written notice "enable the former client to ascertain compliance with the provisions of [the] Rule," as it did not include "a description of the screening procedures employed" nor any other requirement of Rule 1.10(a)(2)(ii). Docket No. 544 at 13 (citing Model Rule 1.10(a)(2)(ii)).

DLA Piper responds that Maxell "cannot genuinely dispute it had notice of DLA's representation of Apple" because Maxell learned that DLA Piper was representing Apple in the ITC matter only two days after the firm was engaged. Docket No. 576 at 12. That same day, Mr. Beaber called Mr. Park, who assured him that none of Maxell's confidential information had been disclosed to anyone on the Apple team. Park Decl. ¶ 8. On August 10, Mr. Park informed Mr. Beaber that he had contacted DLA Piper's OGC regarding an ethical wall. *Id.* ¶ 10. DLA Piper further assured Mayer Brown in writing on September 16, 2020, that no confidential Maxell information had been shared with any DLA Piper attorney and that the ethical wall was fully implemented. Docket No. 554-3, Ex. C (Sept. 16, 2020 email from Peter Lindau to Jamie Beaber).

These communications, DLA Piper claims, "fully satisfied [DLA Piper's] obligations under Model Rule 10(a)(2)(ii)."  Docket No. 576 at 13.

Model Rule 1.10(a)(2)(ii) requires that, when a conflict of interest arises due to an attorney's relationship with a former client, written notice must be "promptly" given to the client. Model R. Prof. Conduct 1.10(a)(2)(ii).  This written notice should include enough detail for the former client to "ascertain compliance with the ethical screening requirements."  *Id.*  This notice shall include: (1) a description of the screening procedures employed; (2) a statement of the firm's and of the screened lawyer's compliance with these Rules; (3) a statement that review may be available before a tribunal; and (4) an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures.  *Id.*

Based on the factual record, the Court cannot conclude that DLA Piper provided Maxell with written notice compliant with Model Rule 1.10(a)(2)(ii) until September 16, 2020, at the earliest.  *See* Docket No. 554-3, Ex. C (Sept. 16, 2020 email from Peter Lindau to Jamie Beaber). Prior to that date, DLA Piper had not provided Maxell with any notice in writing of its screening procedures, let alone a detailed description of those procedures.  DLA Piper's argument that Maxell knew it was representing Apple on July 30—the day the firm filed a Public Interest Statement in the ITC matter and Mr. Beaber called Mr. Park—is misplaced.  It is DLA Piper's burden to demonstrate its compliance with the ethical screening procedures to Maxell.  *See* Model R. Prof. Conduct 1.10(a)(2)(ii).  A telephone conversation and text message exchange between Mr. Park and Mr. Beaber cannot satisfy this burden under the Rules.  *See id.*

But as the Court discussed above, this failure does not justify disqualification.  On balance, the prejudice to Maxell from DLA Piper's failure to provide prompt written notice of its representation of Apple is not so great as to outweigh the significant prejudice to Apple if the Court

were to disqualify its counsel at this advanced stage.  Such an "inflexible application of a professional rule . . . would abrogate" Apple's right to its counsel of choice.  *U.S. Fire*, 50 F.3d at 1314 (citing *Woods*, 538 F.2d at 813).  The possibility of public suspicion here is outweighed by Apple's interest in DLA Piper's continued representation.  *Evolutionary Intelligence*, 2013 WL 12140485, at *19.  And Maxell has not shown how any harm caused by DLA Piper's failure to provide prompt written notice cannot be remedied by ongoing certifications of its compliance.

Because DLA Piper did not show that it promptly complied with the requirements of Model Rule 1.10(a)(2)(ii), the Court will require DLA Piper to provide Maxell written updates regarding DLA Piper's continued compliance, provided at reasonable intervals upon Maxell's request. *Sailsbery v. Vill. of Sauk Vill.*, No. 15 C 10564, 2017 WL 5885323, at *3 (N.D. Ill. Nov. 28, 2017). DLA Piper has previously stated its willingness to do so.  Docket No. 576 at 13 ("DLA also offered to provide certifications . . . at reasonable intervals upon Maxell's request . . . DLA remains willing to do so."); Docket No. 590 at 179:3–7 (DLA has "offered to make repeated certification . . . every 90 days.").  DLA Piper is also ordered to return (or, at Maxell's choice, destroy) all copies of the Maxell documents at issue and confirm its compliance with Maxell and the Court.

After a rigorous review of the factual record, the Court does not believe disqualification is appropriate here.  Maxell has not demonstrated a concern regarding its confidential information that will meaningfully affect litigation in this matter that cannot be cured by the remedies ordered above.  "[W]hen this lack of a meaningful showing that the trial process here will be tainted in any way is weighed against the hardship disqualification would place on [Apple], it is clear that [Maxell's] motion should be denied."  *Reilly*, 423 F.Supp.2d at 13.

## CONCLUSION

For the reasons stated herein, Maxell's motion to disqualify DLA Piper LLP (US) (Docket No 554) is **DENIED**.  DLA Piper's Motion to Strike Certain Portions of Jamie B. Beaber's Declaration in Support of Maxell's Motion to Disqualify (Docket No. 577) is also **DENIED**.  It is

**ORDERED** that DLA Piper shall provide written updates to Maxell regarding DLA Piper's continued compliance with the ethical screening requirements, provided at reasonable intervals upon Maxell's request.  It is further

**ORDERED** that DLA Piper shall return and/or destroy all copies of the Maxell materials at issue and file a notice of compliance with the Court no later than **7 days** after the issuance of this order.

**SIGNED this 2nd day of March, 2021.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE